UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELODIE PARONI, *Individually and on Behalf of the Estate of* EUGENE PARONI,

                                        Plaintiff,

              -v-

GENERAL ELECTRIC UK HOLDINGS LTD,

                                        Defendant.

19 Civ. 1034 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Eugene Paroni ("Eugene"), the late spouse of plaintiff Elodie Paroni ("Elodie"), was diagnosed with, and died of, mesothelioma. Elodie alleges that Eugene's exposure to asbestos during his work on a wind turbine manufactured by Ruston Gas Turbines, Ltd. ("Ruston") caused his mesothelioma. She brings claims for negligence, wrongful death, strict products liability, and loss of consortium. Elodie first brought suit against Alstom SA, which she alleged was a successor in interest to Ruston. However, during jurisdictional discovery, the parties discovered that General Electric UK Holdings Ltd ("GEUKH") was the correct entity and substituted GEUKH for Alstom SA. With leave of Court, Elodie filed a Third Amended Complaint ("TAC") substituting GEUKH for Alstom SA.

The Court previously denied, without prejudice, former defendant Alstom SA's motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), and authorized jurisdictional discovery. *See Paroni v. Alstom SA*, No. 19 Civ. 1034 (PAE), 2020 WL 1033406 (S.D.N.Y. Mar. 3, 2020) ("*Paroni I*"). Jurisdictional discovery is now complete. Before the Court is GEUKH's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2). For the reasons that follow, the Court has determined that GEUKH's motion is

meritorious.  However, as an alternative to dismissing the case, the Court will entertain a motion

from Elodie to transfer the case to California to cure the defect in personal jurisdiction.

## I.      Background[1]

### A.      Eugene's Asbestos Exposure and Injury

Between the 1960s and 1980s, Eugene was exposed to asbestos while working at various

jobsites: (1) as a car repair worker in the 1960s; (2) as a welder for Combustion Power Company

(specifically, the Combustion Power Unit 400 Pilot Plant) in Menlo Park, California between

1970 and 1972; and (3) as an HVAC mechanic for J. Lohr Vineyards & Wines and J&J Air

Conditioning in the 1980s.  TAC ¶ 15.  One of the sources of the asbestos was a "Ruston TA-

1500" turbine, with which Eugene worked in the early 1970s at a California plant.  *Id.* ¶ 16.

Eugene "recalled outside workers taking apart and working on specialized turbine equipment,

including asbestos blankets."  *Id.* ¶ 3.  That turbine was manufactured and sold by Ruston Gas

Turbines, Limited ("Ruston"), *id.* ¶ 17, an English company, *id.* ¶ 3.  Ruston had contracted with

customers in California to "install, repair, and/or service its turbines in the State of California."

*Id.*

In March 2016, Eugene was diagnosed with pleural mesothelioma, a fatal form of cancer

caused by asbestos exposure.  *Id.* ¶ 14; *see also* Cal. Compl. ¶ 2.  On April 19, 2017, Eugene

---

[1] The Court's account of the factual allegations is drawn primarily from the TAC.  On a motion
to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the
four corners of the complaint and consider materials outside of the pleadings, including
accompanying affidavits, declarations, and other written materials.  *See Jonas v. Estate of Leven*,
116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727
(2d Cir. 2012)).  The Court has thus considered the declaration of Dennis E. Vega, Esq., Dkt. 69
("Vega Decl."), and attached exhibits, the complaint from the California action, *see* Dkt. 18, Ex.
A ("Cal. Compl."), and the California state court opinion dismissing that complaint, *see* Dkt. 33-
2 ("Cal. Op.").

passed away; the mesothelioma caused his death.  TAC ¶ 2.  He was survived by his wife,

Elodie, and his two sons, Micah and Jamin.

**B.      The Paronis' Lawsuit in California State Court**

On June 9, 2016—shortly before Eugene passed away—Eugene and Elodie, both

residents of California, sued 25 defendants in the Superior Court of the State of California in the

County of Alameda.  *See id.* ¶ 4; Cal. Compl. ¶¶ 3, 8–32.  They brought claims for negligence,

strict products liability, and loss of consortium related to Eugene's occupational asbestos

exposure.  *See* Cal. Compl. ¶¶ 8–32.

By the time the Paronis brought suit in California state court in 2016, Ruston no longer

existed.  *See* Cal. Op.  The Paronis therefore pursued the parties they believed to be Ruston's

alleged successor(s) in interest.  Initially, the Paronis alleged Siemens AG ("Siemens") was the

successor in interest to Ruston.  *See* Cal. Compl. Later, however, they amended the complaint to

allege Alstom SA as the true successor in interest to Ruston.  *See Paroni I*, 2020 WL 1033406, at

*2 (describing the history of the California action).  The Paronis argued that Ruston became

Alstom Power UK Holdings Limited ("Alstom Power") through a series of name changes, *see*

Cal. Op. at 3, and that Alstom SA, the defendant, was successor in interest to Alstom Power, *see*

*id.* at 2–3.

Alstom SA moved to quash the summons for lack of personal jurisdiction.  *See id.* at 2.

On September 7, 2018, the California state court granted the motion.  Because the court

understood the Paronis to have conceded that the court lacked general jurisdiction over Alstom

SA, the court focused on whether it had specific jurisdiction over Alstom SA.  *Id.*  In finding that

exercising specific jurisdiction would violate due process, the court made three findings.  First

and "most importantly," the Paronis had failed to prove with "admissible evidence" that Alstom

SA was the successor in interest to Alstom Power.  *See id.* at 2–3.  The Paronis had offered only

3

unauthenticated evidence that Ruston had become Alstom Power, and none as to the existence or status of Alstom Power at the time of the suit. *See id.* The Paronis had merely shown that Alstom SA and Alstom Power were "part of the same corporate group and share[d] a single word in their names," which was insufficient to "overcome the general presumption that they are separate and independent entities" under California law. *Id.* at 3. Second, the Paronis had failed to prove by a preponderance that Alstom SA, the defendant, had purposefully availed itself of "forum benefits" by "caus[ing] Ruston, Alstom Power, or any of their purported intermediate entities to purposefully avail themselves of this forum . . . at the time [the Paronis] cause of action arose." *Id.* Third, the Paronis had failed to prove by a preponderance that their suit was "related to" or "ar[ose] from" Alstom SA's California contacts. *Id.* at 2. Although the Paronis apparently offered some evidence of other entities' contacts related to the action, they had not made any such showing for Alstom SA.

The California state court also denied the Paronis' request for jurisdictional discovery; although the Paronis' counsel had orally requested leave to seek it at the hearing, counsel had failed to request it either in their opposition brief or prior to the hearing. *Id.* at 3.

### C.      The Paronis' Lawsuit in This Court

On February 1, 2019, after the dismissal of the California state court action, Elodie filed suit against Alstom in this Court, individually and on behalf of Eugene's estate. Dkt. 2. She asserted the same substantive tort claims brought in California state court—negligence, strict liability, and loss of consortium—plus wrongful death. *Id.* ¶¶ 15–47. The original complaint alleged, "[o]n information and belief," that Alstom SA was "the successor in interest to Ruston" and that it had, after Eugene's exposure, "acquired Ruston, including its asbestos liabilities." *Id.* ¶ 3. The complaint alleged that, although Alstom was incorporated in France, it maintained a

4

headquarters in New York.  *See id.* ¶ 7.  It did not articulate whether Elodie was pursuing general or specific jurisdiction, or both, over Alstom SA.

On July 8, 2019, Alstom SA, specially appearing to challenge jurisdiction, moved to dismiss for lack of personal jurisdiction.  Dkts. 17–18, 21.  The following day, the Court ordered Elodie to either amend her complaint or oppose Alstom's motion to dismiss by July 29, 2019. Dkt. 22.

On August 20, 2019, Elodie filed the Second Amended Complaint.  Dkt. 27 ("SAC").[2] In it, Elodie clarified that she was pursuing a theory of general jurisdiction on the basis that Alstom SA maintained a U.S. headquarters, *id.* ¶ 8, Ex. 12 ("New York Country HQ" listed at 641 Lexington Avenue, 28th Floor, New York, NY 10012), and had regular contact with New York, including real estate, a subsidiary operating under New York law, multiple officers who lived in New York, and 1.4 million euros in New York sales, *see id.* ¶ 18.

In support of her allegation that Alstom SA was the successor in interest to Ruston, the SAC relied on the following series of name changes:

- In 1969, Ruston, the alleged manufacturer of the turbine that released asbestos, *id.* ¶ 2, changed its name to European Gas Turbines Limited;

- In 1998, European Gas Turbines Limited changed its name to Alstom Gas Turbines, Limited;

- In 1999, Alstom Gas Turbines, Limited changed its name to ABB Alstom Power UK Limited;

---

[2] On July 29, 2019, Elodie attempted to file a first amended complaint, which was rejected due to filing deficiencies.  *See* Dkts. 23–24.

On August 15, 2019, Alstom filed a letter asking the Court to grant its motion to dismiss because Elodie had failed to file successfully an amended complaint.  Dkt. 25.  The following day, the Court extended Elodie's time to file an amended complaint until August 20, 2019.  Dkt. 26.

- In 2000, ABB Alstom Power UK Limited changed its name to Alstom Power UK Limited;

- In 2002, Alstom Power UK Limited changed its name to Alstom Power UK Holdings Limited (Alstom Power).

*id.* ¶¶ 2, 10.  It is unclear from the record the extent to which these allegations are the same as those that Elodie presented to the California state court.[3]

On August 21, 2019, the Court ordered that, by September 10, 2019, Alstom SA (1) answer, (2) file a new motion to dismiss, or (3) submit a letter to the Court stating that it relied on its previously filed motion to dismiss.  The same day, Alstom SA filed a second motion to dismiss for lack of subject matter jurisdiction.  Dkts. 29–31.  On September 5, 2019, Elodie filed her opposition.  Dkt. 33.  On September 12, 2019, Alstom filed its reply.  Dkt. 34.  Alstom SA argued that the New York "headquarters" referenced on the website was actually that of one of its subsidiaries.  *Id.* at 4.  In opposition, Elodie asked the Court to deny Alstom's motion, or, in the alternative, permit jurisdictional discovery because Alstom's representations that "the New York headquarters listed on its website is actually a subsidiary rather than its U.S. headquarters" were unsworn statements made by counsel in a memorandum of law.  *Id.* at 7–8.

On March 3, 2020, the Court denied Alstom's motion to dismiss without prejudice and granted Elodie's request for jurisdictional discovery.  *Paroni I*, 2020 WL 1033406, at *5.  The Court found that Elodie had identified a genuine issue of jurisdictional fact, *i.e.*, whether Alstom SA conducted business, or had a domestic headquarters, in New York.  *Id.*  The Court concluded

---

[3] The SAC attached the affidavit of Gemma Baddeley, a solicitor for Siemens, SAC, Ex. 1 ("Baddeley Aff."), which Elodie filed in the California state action.  The Baddeley affidavit alleges that on or around April 26, 2003, Alstom SA, Alstom Power, and Alstom Power Industrial Turbine Services Ltd. sold their turbines business to Siemens.  *Id.*  However, the SAC alleges that Alstom sold either all or a portion of Alstom Power to Demag (later, Siemens), SAC ¶ 11, but retained Alstom Power's asbestos liability, *id.* ¶ 12.

that discovery was necessary to determine whether Alstom SA was in fact Ruston's successor in interest as to the asbestos liabilities. *Id.* The Court, therefore, authorized discovery on two issues: (1) the extent of Alstom's business activities in New York, including its alleged U.S. headquarters and the relationship to its purported New York subsidiary, and any relationship between the U.S. subsidiary and this litigation; (2) Alstom's legal relationship to the Ruston asbestos liabilities. *Id.* at *6.

The Court directed the parties to complete jurisdictional discovery by May 4, 2020. *See id.* It directed Elodie, by May 11, 2020, to file a letter on this docket stating whether she intended to continue pursuing this case in this District or consented to a dismissal for lack of personal jurisdiction, without prejudice. *Id.* at *10.

### D.      Jurisdictional Discovery and GEUKH

The parties then proceeded to jurisdictional discovery. Between April 6, 2020, and July 17, 2020, the Court granted three extensions of time to complete jurisdictional discovery in light of the public health crisis caused by COVID-19. *See* Dkts. 38–44. In the third request for an extension, Elodie alleged that Alstom had provided insufficient discovery. Dkt. 42 at 2–3. She asked the Court to: (1) extend the jurisdictional discovery deadlines, and (2) order Alstom to make available a corporate representative, with knowledge of Alstom's corporate history, for a deposition. *Id.* The only documents Alstom had turned over were 2018 to 2020 registration documents, *id.* at 2, which, Elodie claimed, did not help to resolve the two issues on which the Court had authorized jurisdictional discovery. Over Alstom's opposition, Dkt. 43, the Court granted Elodie's request, adopting her proposed schedule with minor modifications. Dkt. 44.

On August 31, 2020, the parties filed a joint letter notifying the Court that Alstom SA's counsel had identified another entity—GEUKH—as the successor in interest to Ruston. Dkt. 45. Accordingly, the parties requested the Court permit Elodie to substitute Alstom with GEUKH,

who would be represented by Alstom's counsel, Mr. Vega.  *Id.*  GEUKH agreed to accept service and waive a statute of limitations defense to avoid further delays, while also contesting personal jurisdiction.  *Id.*  To determine whether Elodie could establish personal jurisdiction in this District over GEUKH, the parties jointly requested permission for Elodie leave to file the TAC and to adjust the jurisdictional discovery schedule.  *Id.*

On September 1, 2020, the Court granted the motion and directed the parties to submit a schedule that provided for the conclusion of jurisdictional discovery by December 31, 2020. Dkt. 46.  On September 2, 2020, the parties filed a proposed schedule, Dkt. 47, which the Court adopted the following day, Dkt. 48.  On September 22, 2020, Elodie filed the TAC.  The TAC did not indicate whether Elodie was pursuing a general or specific jurisdictional theory with respect to GEUKH.

On November 6, 2020, on consent, Elodie requested another extension of deadlines to complete jurisdictional discovery, Dkt. 59, which the Court granted, Dkt. 60.  On November 24 and December 4, 2020, Elodie deposed GEUKH's designated corporate witness, Ian Graham Ross MacDonald ("MacDonald").  *See* Dkt. 62; *see also id.*, Ex. C (rough transcript of MacDonald deposition).  On December 7, 2020, Elodie moved for another extension of deadlines to complete jurisdictional discovery.  *Id.*  Elodie argued MacDonald was not competent to testify to (1) "the extent to which all companies within [General Electric] are interdependent and/or independent for jurisdictional purposes," *id.* at 2; (2) whether "the GE family of companies is purposefully availing itself of the U.S. marketplace," *id.*; or (3) the "actual transaction that caused [GEUKH] to assume the underlying liabilities for Ruston," *id.*  GEUKH opposed the extension.  Dkt. 63.

On December 11, 2020, the Court denied Elodie's motion. Dkt. 66. The Court granted multiple extensions of the deadline for jurisdictional discovery and had permitted Elodie to take additional discovery after GEUKH emerged as the proper defendant. The Court refused to grant Elodie additional time to pursue the new theory of discovery she envisioned, based on GEUKH's relationship with GE. *Id.*

On December 14, 2020, GEUKH filed a motion to dismiss for lack of personal jurisdiction, Dkt. 67, supported by a memorandum of law, Dkt. 68 ("Def. Mem."), affirmation and exhibits, Vega Decl. On December 18, Elodie filed a memorandum of law in opposition. Dkt. 70 ("Pl. Opp'n"). On December 22, 2020, GEUKH filed a reply, with supporting exhibits. Dkt. 71 ("Def. Reply").

## II.    Applicable Legal Standards

### A.    Legal Principles Governing Motions to Dismiss Under Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2012). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Before jurisdictional discovery, a plaintiff's *prima facie* showing of jurisdiction "may be established solely by allegations." *Ball*, 902 F.2d at 197. But where—as here—plaintiff has conducted jurisdictional discovery, a plaintiff's *prima facie* showing must be "factually

9

supported," *i.e.*, the showing must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball*, 902 F.2d at 197); *see also Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 502 (S.D.N.Y. 2004). The plaintiff's factual averments are presumed true "to the extent they are uncontroverted by the defendant's affidavits." *MacDermid*, 702 F.3d at 727 (quotation omitted).

In assessing the plaintiff's showing, the court applies a "standard . . . akin to that on a motion for summary judgement," construing the "pleadings, documents, and other evidentiary materials . . . in the light most favorable to the plaintiff and all doubts are resolved in its favor." *Melnick*, 346 F. Supp. 2d at 503 (citing *Kamen v. AT&T Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986)); *see Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No. 05 Civ. 10773 (RMB), 2007 WL 1489806, at *2 (S.D.N.Y. May 21, 2007). "At the same time, particularly given the amount of time provided for jurisdictional discovery, the Court will limit its jurisdictional analysis to the facts presented and must assume that the [p]laintiffs have provided all the evidence they possess to support their jurisdictional claims." *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001).

Although Rule 12(b)(2) motions cannot be converted into a Rule 56 motion for summary judgment when extrinsic evidence is considered, the Rule 56 standard nevertheless guides the Court as to the documents it may consider outside of the pleadings. *See Big Apple Pyrotechnics & Multimedia Inc. v. Sparktacular Inc.*, No. 05 Civ. 9994 (KMW), 2007 WL 747807, at *1 (S.D.N.Y. Mar. 9, 2007) (citing *Kamen*, 791 F.2d at 1011). Under that rule, a court, in resolving a Rule 12(b)(2) motion made after jurisdictional discovery, may consider only *admissible*

evidence.[4]  *Cf. Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (motion for summary

judgment).  Accordingly, affidavits or declarations in support of personal jurisdiction "must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

### B.      Legal Principles Governing Personal Jurisdiction

For a federal court to lawfully exercise personal jurisdiction, three primary requirements

must be met.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir.

2012).  First, "the plaintiff's service of process upon the defendant must have been procedurally

proper."  *Id*. (citing *Murphy Bros, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350

(2d Cir. 2012)).  Second, "there must be a statutory basis for personal jurisdiction that renders

such service of process effective."  *Id.*  Third, "an exercise of [personal] jurisdiction under these

laws [must be] consistent with federal due process requirements."  *Grand River Enters. Six*

*Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005); *see generally Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462 (1975).

### 1.      Service of Process

"Before a federal court may exercise personal jurisdiction over a defendant, the

procedural requirement of service of summons must be satisfied."  *Dynegy Midstream Servs. v.*

---

[4] Courts commonly decline to rely on inadmissible evidence in the context of Rule 12(b)(2)
motions made after jurisdictional discovery.  *See, e.g.*, *DeLorenzo v. Ricketts & Assocs.*, No. 15
Civ. 2506 (VSB), 2017 WL 4277177, at *7 n.13 (S.D.N.Y. Sept. 25, 2017) (declining to rely on
inadmissible hearsay evidence in resolving Rule 12(b)(2) motion), *aff'd sub nom. DeLorenzo v.
Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018) (summary order); *Nationwide Mut. Ins.
Co. v. Morning Sun Bus Co.*, No. 10 Civ. 1777 (ADS), 2011 WL 381612, at *5 (E.D.N.Y. Feb. 2,
2011) (same for inadmissible statement in, and attachment to, memorandum of law);
*Moneygram*, 2007 WL 1489806, at *3 n.5 (noting that defendant had not presented any
admissible jurisdictional evidence, aside from his deposition testimony, and that the court had
excluded an affidavit because it was not based on personal knowledge).

*Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (citation omitted).  Federal Rule of Civil Procedure

4 governs the content, issuance, and service of a summons.  Here, GEUKH agreed to accept

service to avoid delays through the Hague Convention.  Dkt. 45.

### 2.  Statutory Basis

A court must have a statutory basis for asserting personal jurisdiction over each

defendant based on the long-arm statute of the state in which it sits.  *See Eades v. Kennedy, PC*

*L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015) ("To determine personal jurisdiction over a non-

domiciliary in a case involving a federal question, we first apply the forum state's long-arm

statute." (cleaned up)).  New York's long-arm statute provides for general and specific

jurisdiction.[5]  General jurisdiction is authorized under § 301 of the New York Civil Practice Law

and Rules ("C.P.L.R.").  Specific jurisdiction is authorized under § 302(a); this provision has

four subsections corresponding to different categories of conduct that justify an exercise of

specific jurisdiction.  *Vasquez v. Hong Kong and Shanghai Banking Corporation, Ltd.*,

477 F. Supp. 3d 241, 252 (S.D.N.Y. 2020).  These categories include a defendant's in-state

business transaction, in- and out-of-state tortious conduct, and in-state ownership of real

property.  *See* C.P.L.R. § 302(a).

---

[5] There are two types of personal jurisdiction: general and specific.  General personal jurisdiction
subjects a defendant to suit on all claims.  *Cortlandt St. Recovery Corp. v. Deutsche Bank AG*,
No. 14 Civ. 1568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015); *see also Goodyear
Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  A court may assert general
jurisdiction over a corporation where its "affiliations with the State are so 'continuous and
systematic' as to render [it] essentially at home in the forum State."  *Daimler AG v. Bauman*, 571
U.S. 117, 127 (2014) (quoting *Goodyear*, 564 U.S. at 919).  Specific personal jurisdiction
subjects a defendant to suit on only claims that arise from the defendant's conduct in the
forum.  *Cortlandt St. Recovery Corp.*, 2015 WL 5091170, at *2; *see also Daimler*, 571 U.S. at
126–27.  Although she notes that General Electric is subject to general jurisdiction in New York,
Elodie only asserts specific jurisdiction as to GEUKH.

Elodie asserts that this Court has specific personal jurisdiction over GEUKH under C.P.L.R. 302(a)(1).  Section § 302(a)(1) provides for specific jurisdiction over a non-domiciliary where two conditions are met.  First, the defendant must "transact[] . . . business within the state or contract[] anywhere to supply goods or services within the state[.]"  *Id.*  Second, the cause of action must arise from the "act[s] which are the basis of jurisdiction."  *Id.*  This second condition requires a showing that the contacts with the state had a "substantial relationship" to the cause of action.  *See Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981)).

"Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff . . . or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York."  *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983) (internal citations omitted).  Commercial torts can refer to scenarios where a plaintiff has "lost business."  *Penguin Group (USA) Inc. v. American Buddha*, 16 N.Y.3d 295, 304 (2011).  In this sense, they stand in contradistinction to "torts causing physical harm."  *Id.* at 303 (distinguishing the locus of injury in commercial cases from those in physical injury cases).  In cases involving torts causing physical injuries, courts generally look to where the injury "took place," because that is where "every relevant occurrence connecting" the injury and the tort claim happened.  *Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321–22 (2d Cir. 1964).

Section 302(a)(1) is a "single act" statute; therefore, the defendant need not have engaged in more than one transaction in, or directed to, New York for New York courts to exercise jurisdiction.  *See Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006).  Jurisdiction under § 302(a)(1) exists even if "the defendant never enters New York, so long as

the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). A court may also find jurisdiction based on the totality of the defendant's conduct. *See, e.g.*, *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.").

### 3. Due Process

Once a *prima facie* showing of a statutory basis for jurisdiction has been made, the plaintiff must "demonstrate that the exercise of personal jurisdiction comports with due process." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81–82 (2d Cir. 2018); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The constitutional analysis under the Due Process Clause consists of two separate components: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Licci*, 673 F.3d at 60 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)).

The "minimum contacts" inquiry examines "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." *Id.* The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" such that the defendant "should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 474–75). To satisfy this minimum-contacts inquiry, the Court "recogniz[es] two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford Motor*

14

*Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021).  "A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Id.* (quoting *Goodyear*, 564 U.S. at 919).  In the paradigm cases—and when the defendant is a corporation, rather than an individual—this usually means the corporation's state of incorporation or principal place of business.  *See id.*  General jurisdiction, as its name implies, extends to "any and all claims" brought against a defendant, whether or not they "relate to the forum State or the defendant's activity there."  *Id.*  Specific jurisdiction, on the other hand, covers "defendants less intimately connected with a State," and thus covers a "narrower class of claims."  *Id.*  In these cases, "there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Id.* at 1025 (citation omitted).

The "reasonableness" inquiry examines "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloe*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316).  The Court considers:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Id.* at 164–65 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 113–14 (1987)).

## III.   Discussion

### A.   General Jurisdiction

Although Elodie at points disclaims a theory of general jurisdiction over GEUKH, *see, e.g.*, Pl. Opp'n at 2 ("Plaintiff respectfully asserts the exercise of specific personal jurisdiction over GEUKH . . . ."), GEUKH argues that, in reality, Elodie is "asking this Court to exercise

general jurisdiction, disguised as specific jurisdiction," specifically by contending that GEUKH

is tantamount to GE, over whom there would be general jurisdiction in New York.  Def. Reply at

8.  For example, Elodie makes repeated references to the fact that GEUKH "has 'no employees,

no revenues,'" that GE "owns 100% of [GEUKH's] share capital," and that GE and GEUKH are

"one corporate entity."  Pl. Opp'n at 5.

Accordingly, in the interest of completeness, the Court first considers whether it has

general jurisdiction over GEUKH.

Elodie focuses on the contacts between GE and New York (*e.g.*, GE's New York

headquarters) rather than those between GEUKH and New York.  As such, Elodie appears to

contend that general jurisdiction over GEUKH can be exercised derivatively based on GE's New

York contacts.  For such an argument to prevail, Elodie would need to pierce the corporate veil

between GE and GEUKH.  *See Fagan v. Republic of Austria*, No. 08 Civ. 6715 (LTS) (JCF),

2011 WL 1197677, at *17 (S.D.N.Y. Mar. 25, 2011) ("A court may exercise personal

jurisdiction over a subsidiary based on its jurisdiction over the parent company only when the

subsidiary is an 'alter ego' or 'mere department' of the parent company.").

The standards for piercing the veil in the context of personal jurisdiction are lower than

those in the context of establishing liability, but a "parent cannot assume the jurisdictional status

of its subsidiary unless factors beyond common ownership suggest that their separate corporate

identities are a mere façade."  *Id.* (quotation and citation omitted).  "Instead, there must be a

finding of 'extraordinary control.'"  *Id.* (quotation and citation omitted).  The Second Circuit has

identified four factors to consider in determining whether a subsidiary is an alter ego or mere

department of the parent: "(1) whether there exists common ownership and the presence of an

interlocking directorate and executive staff, (2) the degree of financial dependency of the

16

subsidiary on the parent, (3) the degree to which the parent interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of the parent's control of the subsidiary's marketing and operational policies." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir. 1984)).

Measured against these standards, Elodie has not shown facts sufficient to pierce the corporate veil. She notes only her allegation that GE "maintains 100% of voting securities for [GEUKH]," TAC ¶ 12, a point which GEUKH persuasively contests,[6] and the testimony of GEUKH's designated corporate witness, MacDonald, that the two entities were "one corporate entity" because "to think otherwise would be a sham." *See* Vega Decl., Ex. I ("MacDonald Nov. Tr.") at 62, 64.[7] But as MacDonald explained, he meant by this locution only to express that it would be a sham to say that he continued to work for the Alstom family of companies after the acquisition. *See id.* at 64. Significantly, as context for the statement on which Elodie seizes, MacDonald further testified that GEUKH is "an independent entity, and it is incidental that the fact it may ultimately indirectly be held by [GE]." *Id.* And, MacDonald explained, GEUKH has its own corporate bank account, separate from its immediate parent, that is not accessible by GE,

---

[6] In fact, GEUKH avers that it is directly owned by GE Grid Solutions UK B.V., a private limited company incorporated in the Netherlands. Def. Mem. ¶ 20. In suggesting otherwise, Elodie points to a 2018 SEC subsidiaries and affiliates disclosure statement filed by GE. *See* TAC ¶ 12 n.1. That disclosure indicates that GE owns 100% of the voting shares of GEUKH, but it does not specify whether GE holds these directly or indirectly.

[7] MacDonald was deposed on two occasions, November 24, 2020 and December 4, 2020. *See* Vega Decl. ¶¶ 10–11; *see also id.*, Ex. J ("MacDonald Dec. Tr.") (rough transcript from MacDonald's December 4, 2020 deposition).

*see id.* at 88–89, and that "it is a holding company and it has investments in a number of companies, around 15 in total, [and is] . . . certainly not a sham company," *id.* at 99.  Elodie has not demonstrated that GEUKH is anything other than an indirect subsidiary of GE.  She has not adduced evidence that GE enjoys extraordinary control over GEUKH.

Nor can Elodie demonstrate that GEUKH is subject to general jurisdiction in New York because it is "essentially at home" here.  *See Daimler AG*, 571 U.S. at 139.  Excepting the alleged agreement between GE and GEUKH under which GEUKH would assume Alstom's asbestos liabilities, Elodie has not identified a single other contact GEUKH has with New York, let alone sufficient contacts to subject it to the state's general jurisdiction.

### B.        Specific Jurisdiction

Elodie's primary argument is that GEUKH is subject to specific personal jurisdiction in New York.   As the factual basis for this argument, she posits that corporate parent GE itself first purchased the liabilities of Alstom's power and grid businesses, and later engaged in a separate transaction with its subsidiary GEUKH, which took place in New York, in which GE transferred these liabilities to GEUKH.  Elodie argues that her claims "arise out of" this transaction, which she posits must have occurred in New York because GE maintains a headquarters there.

At the outset, Elodie has not demonstrated by a preponderance of the evidence her core factual premise: that there was ever a transaction (let alone one in New York) between GE and GEUKH in which GEUKH acquired the asbestos liabilities of Alstom's that GE had earlier acquired.  Despite jurisdictional discovery, Elodie has not produced evidence—documentary or testimonial—of any such transaction or series of events.  Elodie instead urges that the existence of such a transaction can be inferred from the premise that, otherwise, Alstom's liabilities would still be "with [GE]."  Pl. Opp'n at 9.  She infers that GEUKH must have "stepped into the shoes [of GE]."  *Id.* at 5 (quoting MacDonald Nov. Tr. at 44).

A sequence of events theoretically could have occurred along the lines Elodie posits, in which the GE parent (1) purchased Alstom's asbestos liabilities from Alstom; and (2) later, in New York, engaged in a transaction in which it sold them to its GEUKH subsidiary. *See* Pl. Opp'n at 10. But after jurisdictional discovery, the admissible evidence, not a party's pleading or say-so, controls. And the evidence adduced in jurisdictional discovery reveals that Alstom's asbestos liabilities came to rest with GEUKH in a different manner altogether. It reflects that there was indeed a transaction, in 2015, in which GE purchased Alstom's power and grid businesses, one subsidiary of which (Alstom UK Holdings Ltd) held the asbestos liabilities. But there is no evidence that these liabilities ever were held by the GE parent. Rather, as defendants explain, as part of the transaction, Alstom UK Holdings Ltd was renamed GEUKH, although the corporate renaming did not occur until 2020. *See* Def. Reply at 4–6. For the asbestos liabilities to come to reside in GEUKH, there was thus no occasion for GE itself to hold these liabilities, or for a transaction between GE and GEUKH.

In positing otherwise, Elodie seizes on a sound-bite from MacDonald's testimony that "[GEUKH] have *agreed* to take on the liabilities." MacDonald Nov. Tr. at 44 (emphasis added). But, presented in context, this testimony does not reveal an agreement in which GE sold these liabilities to GEUKH:

> Q. So . . . your belief is that the business entities that manufactured and sold the turbines namely Ruston through a series of corporate name changes and acquisitions, the liabilities came to reside in the Alstom family and then eventually in GE UK Holdings Limited; is that correct?
>
> A. No. What I'm saying is that the liabilities came to reside in a company called Alstom Power UK Holdings Limited, and that company was dissolved . . . [and] as a corporate lawyer, I understand that when a company is dissolved, the liability . . . dissolves with it. General Electric UK Holdings Limited have agreed to take on the liabilities relating to Alstom Power UK Holdings Limited, and they have stepped into the shoes or they have agreed to take on the responsibility or the liability arising from this case.

19

*Id.* at 43–44.

And the documentary evidence adduced in jurisdictional discovery makes clear that at the time GE acquired Alstom's grid and power businesses, these liabilities resided with Alstom UK Holdings Ltd, which was renamed GEUKH following the acquisition.  The evidence reflecting that Alstom UK Holdings Ltd had come to hold these liabilities consists of a Companies House[8] certificate of name change, showing that Ruston, which originally held the liabilities, became, through a series of name changes, Alstom Power.  *See* Def. Reply, Ex. A (Companies House certificate showing an unbroken chain of name changes from Ruston to "Alstom Power UK Ltd").  A Companies House financial disclosure report, in turn, reflects that in 2009, consistent with MacDonald's testimony, Alstom Power was liquidated by its immediate parent, Alstom Contracting Ltd, whose immediate parent was Alstom UK Holdings Ltd.  *See id.*, Ex. B.  On July 16, 2013, Alstom Contracting Ltd changed its name to Newbold Contracting Ltd, *see id.*, Ex. C (Companies House certificate of name change), and on March 18, 2014, Newbold Contracting Ltd was liquidated by Alstom UK Holdings Ltd, its immediate parent, *see id.*, Ex. D (Companies House dissolution record for Newbold Contracting Ltd).  On May 18, 2020, following the acquisition by GE, Alstom UK Holdings Ltd changed its name to GEUKH.  *See id.*, Ex. G (Companies House certificate of name change for Alstom UK Holdings Ltd).  Accordingly, the entity that would become GEUKH already held the liabilities before the acquisition.  This comports with MacDonald's testimony that GEUKH "stepped into the shoes" of the former Alstom entity that held the liabilities.  Indeed, Elodie herself acknowledges that "GEUKH is the

---

[8] Companies House is the registrar of companies for the United Kingdom, and its documents are publicly available.

same company as Alstom UK Holdings Ltd just 'with a different company name.'" Pl. Opp'n at 4 (quoting MacDonald Nov Tr. at 14). This documentary record establishes that the asbestos liabilities at issue came to rest with GEUKH, without any need for a transaction in New York between GE and GEUKH.

In urging otherwise, Elodie also relies on MacDonald's testimony that a Christiaan Johnson, who works for Electric Insurance—a GE subsidiary that has "delegated responsibility for personal injury industrial disease [insurance] claims," *see* MacDonald Nov. Tr. at 38–39— told him that GEUKH "would take responsibility for the liabilities in this case," Pl. Opp'n at 5 ("That GEUKH acquired the liabilities pertinent to this case was a fact 'presented' to Mr. MacDonald by Christian [sic] Johnson, an employee of [GE].").  But that testimony does not carry the freight necessary to support personal jurisdiction in New York, either.  Johnson's statement as recounted by MacDonald conveys, as is undisputed, that GEUKH holds the asbestos liabilities at issue.  But it does not say that these came to be held by GEUKH by virtue of an intra-GE transaction in New York.  That GEUKH would "take responsibility" for these liabilities reveals only that GEUKH acknowledges it today is the successor in interest to Ruston as to them.[9]

Finally, Elodie notes MacDonald's testimony that GE "understood that Alstom had taken over the liabilities of Ruston, and when the Alstom Group of companies was acquired by GE, GE continued to honor that undertaking." Pl. Opp'n at 6 (quoting MacDonald Dec. Tr. at 40).  But that testimony does not suggest that the GE parent ever itself acquired the liabilities at issue.

---

[9] Elodie's synopsis also mischaracterizes MacDonald's testimony: MacDonald did not testify that Johnson was an "employee of GE," but rather that he was an employee of a GE subsidiary. *See* MacDonald Nov. Tr. at 38 ("I don't know his official title, but he is a U.S. attorney who works for Electric Insurance . . . .").

In sum, Elodie has not established any transaction in New York involving GEUKH. The sole transaction she has established is GE's acquisition of Alstom's overall grid and power businesses, a consequence of which was the renaming as GEUKH of Alstom's subsidiary that owned the asbestos liabilities traceable to Ruston.

### 1.       Statutory Basis for Jurisdiction

Having established that the only transaction of potential relevance here is GE's 2015 acquisition of Alstom SA's overall power and grid businesses, the Court must determine whether Elodie's claims "arise out of" that acquisition. Because defendants do not contest the point, the Court assumes *arguendo* that that transaction occurred in New York, where GE is headquartered.

Elodie's claims—involving an injury caused by an alleged tort committed between the 1960s and 1980s, decades before the corporate acquisition at issue—clearly do not arise from that 2015 acquisition. Quite to the contrary, as the Second Circuit has recognized, cases are to be dismissed on jurisdictional grounds for lack of a sufficient nexus between the parties' New York contacts and the claim asserted where "the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York." *Sole Resort*, 450 F.3d at 104.

Such is the case here. Eugene's injuries, as pled, trace to his asbestos exposure between the 1960s and 1980s, in the course of employment centered in California. They were not caused by, and cannot coherently be said to arise from, a New York transaction decades later, in 2015, that resulted in the transfer to the GE corporate family of the business unit housing these asbestos liabilities. There is thus no "arising from" jurisdiction under section 302(a). *See, e.g.*, *id.* (dismissal required where "the injuries sustained and the resulting disputes bore such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having 'arisen from' the New York

activity" for purposes of section 302(a)); *see also Johnson v. Ward*, 4 N.Y.3d 516, 519–20 (2005) (dismissal required where plaintiffs' personal injury tort claims arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration for purposes of section 302(a)(1)); *Holness v. Mar. Overseas Corp.,* 251 A.D.2d 220, 223–25 (1st Dep't 1998) (dismissal required where plaintiff ship repairman's claims arose from injuries sustained while working in Virginia, not from a service contract between the New York shipowners and repairman's Virginia-based employer); *Gelfand,* 339 F.2d at 321 (dismissal required where plaintiffs' claim for injuries sustained in bus crash in Arizona arose from negligent acts committed in Arizona, not the purchase of bus tickets in New York).

### 2.    Due Process

In any event, exercising personal jurisdiction over GEUKH would not comport with due process.  Elodie's argument to the contrary flows from the same incorrect factual premise debunked above, as to how GEUKH came to house Alstom's asbestos liabilities.  *See* Pl. Opp'n at 9–10 (positing that, because GEUKH ostensibly agreed to accept these liabilities from GE, there must have been a "tacit and concomitant understanding that . . . GEUKH is submitting to the jurisdiction . . . of any Court in which General Electric Company (the original holder of the asbestos liabilities) could be sued with respect to said liabilities").  As explained, that premise is wrong.  And it is undisputed that GEUKH does not conduct business in New York, maintain a premises in New York, or have employees in New York.  Accordingly, to subject GEUKH to any court in which GE could be sued would be to subject a subsidiary to jurisdiction in all courts that have general jurisdiction over its parent.  There is no case authority to that effect.  On the contrary, the case law holds that, absent a valid basis for veil piercing, a parent's contacts do not establish a subsidiary's minimum contacts.  *See, e.g.*, *Fagan*, 2011 WL 1197677, at *17 ("A court may exercise personal jurisdiction over a subsidiary based on its jurisdiction over the

parent company only when the subsidiary is an 'alter ego' or 'mere department' of the parent company."); *Indem. Ins. Co. of N. Am. v. Expeditors Int'l of Wash., Inc.*, 382 F. Supp. 3d 302, 310 (S.D.N.Y. 2019) (same); *In re Lyondell Chem. Co.*, 543 B.R. 127, 142–43 (Bankr. S.D.N.Y. 2016) ("New York courts will also pierce the corporate veil in reverse . . . when the subsidiary is an 'alter ego' or 'mere department' of the parent company." (internal citations and quotations omitted)).[10]

Finally, Elodie argues that if GEUKH is not subject to personal jurisdiction in New York, "a corporate giant, like [GE] [could] acquire asbestos or other liabilities, enter into an agreement with a foreign subsidiary whereby the foreign subsidiary agrees to assume the liabilities, and then use said foreign subsidiary's lack of presence in New York as a jurisdictional bar." Pl. Opp'n at 10. That outcome, she states, would "rob American victims" of "an avenue through which to seek redress" and "render[] the assumption of asbestos liabilities meaningless." *Id.* Hyperbole aside, Elodie's argument is wrong. After a corporate transaction transferring ownership of the liabilities, courts in the state where the alleged tort occurred, in this case California, would continue to have specific jurisdiction over claims arising from the tort, under settled case law regarding successor liability. *See U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 156–57 (2d Cir. 2019) (recognizing that certain types of successor liability, such as those accomplished through merger, permit the exercise of personal jurisdiction over the successor "where the actions of the predecessor would have made the predecessor subject" to jurisdiction); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 644

---

[10] *Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019), to which Elodie points, is not to the contrary. The United Kingdom defendant there regularly "flew prices" and "printed trades" in the course of its business with New York clients. *See id.* at 382. There is no evidence of the sort here.

24

(N.D. Cal. 2020) ("Personal jurisdiction over a successor company exists where (i) the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor." (internal quotations and citations omitted)); *Lefkowtiz v. Scytl USA*, No. 15 Civ. 05005 (JSC), 2016 WL 537952, at *3 (N.D. Cal. Feb. 11, 2016) ("A court 'will have personal jurisdiction over a successor company if (1) the court would have had personal jurisdiction over the predecessor[;] and (2) the successor company effectively assumed the subject liabilities of the predecessor.'" (quoting *CenterPoint Energy, Inc. v. Superior Court*, 69 Cal. Rptr. 3d 202, 218 (Ca. Ct. App. 2007))).

### C.      Transfer

The absence of personal jurisdiction over GEUKH raises the question of how to dispose of this case.  GEUKH moves for dismissal under 12(b)(2).  The Second Circuit, however, has interpreted 28 U.S.C. § 1406(a) to permit courts to transfer a case, in the interest of justice, to cure a lack of personal jurisdiction.  *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435–36 (2d Cir. 2005); *see also Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465–66 (1962) (courts may transfer a case pursuant to § 1406(a) even where it lacks personal jurisdiction over the defendant).  With Elodie having now successfully identified the corporate successor-in-interest to the Ruston asbestos liabilities, the Court would entertain a motion to transfer the case to a federal district court in California, where specific jurisdiction lies.  Any such motion is due two weeks from the date of this order; in the event the Court does not receive such a motion, it will dismiss the case without prejudice, for want of personal jurisdiction.  Defendant's opposition, if any, is due one week after the motion to transfer.

**CONCLUSION**

For the foregoing reasons, the Court holds that it lacks personal jurisdiction over GEUKH.  The Clerk of Court is respectfully directed to terminate the motion pending at docket 67, terminate defendant Alstom SA, and update the caption to reflect the caption above.

However, insofar as the Court has invited a motion to transfer this case to a federal district court in California, the Clerk of Court is respectfully directed not to terminate this case, pending the resolution of such a motion.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 9, 2021
       New York, New York